IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA, )
                            )      Civil No. 4:19-cv-00212
        Plaintiff,     )
                            )
        v.            )      VERIFIED COMPLAINT FOR
                            )      FORFEITURE *IN REM*
$8,623.00 IN U.S. CURRENCY,   )
                            )
        Defendant.    )
                            )

Plaintiff, United States of America hereby files and serves this VERIFIED COMPLAINT IN REM and alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is an action to forfeit and condemn specific property to the use and benefit of the United States of America ("Plaintiff") for involvement, as set forth below, in violations of 21 U.S.C. § 846 (attempt and conspiracy) and § 841(a)(1)(prohibited acts).

2.    The United States believes the Defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) as money or a thing of value furnished or intended to be furnished by a person in illegal exchange for a controlled substance, in violation of subchapter I – Control and Enforcement, of Chapter 13 – Drug Abuse Prevention and Control,

and Title 21 – Food and Drugs, of the United States Code, and proceeds traceable to such an exchange, and money used or intended to be used to facilitate any violation of said subchapter.

3.    The United States believes the Defendant property is subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1), as personal property involved in a violation of 18 U.S.C. § 1960 or property traceable to such property.

## II.    DEFENDANT *IN REM*

4.    The Defendant property is generally described as $8,623.00 in U.S. currency as a result of a traffic stop of two motorcycles involving Kristopher Bryan Clementi and Heather Marie Newhouse, at or near 1221 E. 27th Court, Des Moines Iowa. The Defendant property is in the custody of the local law enforcement agency.

## III. JURISDICTION AND VENUE

5.    This Court has jurisdiction over an action commenced by the United States of America under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

6.    This Court has *in rem* jurisdiction and venue over the defendant property under 28 U.S.C. §§ 1355(b) and 1395(b) as the acts

2

or omissions giving rise to the forfeiture occurred in this district and because the defendant property was seized from and is located in this district.

## IV. FACTS

7.      The AControlled Substances Act@ was enacted by Congress as Title II of the AComprehensive Drug Abuse Prevention and Control Act of 1970,@ Pub.L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801-904).

8.      The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

9.      Schedule I substances have a high potential for abuse, have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of these controlled substances under medical supervision. 21 U.S.C. § 812(b)(1)(A)–(C).

10.     Schedule II substances have a high potential for abuse. Though Schedule II controlled substances have a currently accepted medical use in treatment in the United States or a currently accepted

3

medical use with severe restrictions, use of a Schedule II controlled substance may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2)(A)–(C).

11.   Schedule III substances have a lesser potential for abuse than the substances in Schedules I and II and have a currently accepted medical use for treatment in the United States, but abuse of the controlled substances may lead to a moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3)(A)–(C).

12.   Schedule IV controlled substances have a low potential for abuse relative to the controlled substances in Schedules I through III, have a currently accepted medical use in treatment in the United States, but abuse of the controlled substances may lead to limited physical dependence or psychological dependence relative to the controlled substances in Schedule III. 21 U.S.C. § 812(b)(4)(A)–(C).

13.   Schedule V controlled substances have a low potential for abuse relative to the substances in the preceding schedules, have a currently accepted medical use for treatment in the United States, but abuse of the controlled substances may lead to limited physical

4

dependence or psychological dependence relative to the controlled substances in Schedule IV. 21 U.S.C. § 812(b)(5)(A)–(C).

14.   Only persons registered by the Attorney General of the United States, in accordance with rules and regulations promulgated by the Attorney General, may legally manufacture or distribute controlled substances. 21 U.S.C. § 822(a), (b).

15.   Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute, a controlled substance, unless authorized by law to do so.  21 U.S.C. § 841(a)(1).

16.   Under the Controlled Substances Act, it is unlawful to conspire with others to violate its prohibitions.  21 U.S.C. § 846.

17.   Under the Controlled Substances Act, all moneys or things of value furnished or intended to be furnished by any person in an illegal exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate a violation of Subchapter I of the Controlled Substances Act, is subject to forfeiture to the United States and no property right shall exist in such property. It is illegal, under federal law, for a person to knowingly conduct all or part of an unlicensed money transmitting business, which

5

affects interstate commerce, which involves the transportation of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

18.   Any person involved in the transmission of the Defendant property as part of money transmitting business was required by law to have been registered with the U.S. Department of the Treasury, Financial Crimes Enforcement Network (FINCEN), when doing so.

19.   The property involved in an illegal, unlicensed money transmitting business is forfeitable under federal law.

20.   It is believed that evidence will show, or will after a reasonable opportunity for further investigation and discovery, that the Defendant property constituted the proceeds of a prohibited controlled substance offense, or was used or intended to be used to facilitate a prohibited controlled substance offense, or was involved in a violation of 18 U.S.C. § 1960.

21.   Around midnight on December 18, 2018, two Des Moines Police Department (DMPD) officers stopped a motorcycle southbound on East 27th Court Avenue in Des Moines, Iowa, in the Southern District of

Iowa, for a traffic violation, namely having an improperly affixed license plate.

22.    As the officers pulled in behind the motorcycle and another motorcycle travelled with it, the two motorcycles abruptly pulled into a nearby driveway.

23.    The officers exited their vehicle, and first made contact with a woman who later identified herself as "Jessica Clementi," the driver of the offending motorcycle.

24.    "Jessica Clementi" lied about her identity throughout the encounter, in part because she had outstanding warrants for her arrest. She was later identified by law enforcement as Heather Marie Newhouse.

25.    The officers noticed she was carrying a red and black drawstring bag on her back.

26.    One of the officers smelled the strong odor of marijuana on the driver of the other motorcycle, CLEMENTI.

27.    CLEMENTI admitted he had marijuana on him.

28.    The officers thereafter lawfully detained CLEMENTI.

29.    CLEMENTI was handcuffed for officer safety, among other reasons.

30.    During a probable cause search of CLEMENTI, an officer located a small amount of marijuana on CLEMENTI.

31.    Also during the search, an officer located a large amount of currency, estimated at approximately $5,420, in CLEMENTI pants' pocket.

32.    While CLEMENTI was still being searched, he attempted to run away from the officers.

33.    CLEMENTI ran a short distance, and then stumbled, and fell to the ground.

34.    After being re-apprehended, CLEMENTI admitted he had a firearm on him.

35.    It is illegal under federal law to be a drug user in possession of a firearm.

36.    CLEMENTI admitted he had a prior felony conviction.

37.    In fact, CLEMENTI's criminal history includes a 2000 conviction in Polk County, Iowa for possession of methamphetamine with the intent to distribute, a 2010 conviction in Polk County, Iowa for possession of marijuana (third offense), a 2015 conviction in Polk County, Iowa for possession of methamphetamine and possession of Alprazolam,

and another 2015 conviction in Polk County, Iowa for possession of methamphetamine and marijuana.

38.    It is illegal under federal law to be a felon in possession of a firearm.

39.    When the search of CLEMENTI was resumed, an officer discovered a firearm on CLEMENTI, as well as additional currency ($2,503).

40.    The firearm was a loaded Smith & Wesson M&P Shield 9 millimeter caliber pistol, with serial number HNY1837. The firearm had one live round in the chamber and seven live rounds in the magazine.

41.    In full, approximately $8,023 was found on CLEMENTI.

42.    It is common for persons participating in the drug trafficking trade to carry firearms with them, to protect themselves and their drugs and/or the profits of their drug dealing.

43.    It is common for person to participating in the drug trafficking trade to transact business on a cash basis, to avoid creating financial records of their illicit actions.

44.    After CLEMENTI was secured, the officers reinitiated contact with the driver of the other motorcycle, NEWHOUSE.

45.   At the time, one of the officers observed NEWHOUSE was no longer carrying the backpack she had on her when first stopped.

46.   NEWHOUSE falsely denied ever having a backpack.

47.   During a short search of the vicinity near NEWHOUSE, an officer discovered the backpack.

48.   When the officer looked inside the abandoned backpack that NEWHOUSE denied having, he discovered a firearm, namely a loaded Ruger LCP II .380 auto caliber pistol, with serial number 380017250 with six live rounds in the magazine.

49.   A trace of the Ruger LCP II pistol revealed it was a stolen firearm.

50.   Inside the bag, the officer also found a pouch with four baggies containing a white, crystalline substance that field-tested positive for methamphetamine (weighing approximately 50 grams with packaging), a meth pipe, two plastic baggies with pills, and multiple needles.

51.   Law enforcement also found $600 on NEWHOUSE.

52.   NEWHOUSE said she would be willing to speak to the officers.

53.   NEWHOUSE was read her *Miranda* rights, and consented to be interviewed.

54.   This interview was recorded.

55.   NEWHOUSE admitted she had the bag, but claimed it was given to her by a male, "CP."

56.   NEWHOUSE said CP asked her to deliver the bag to another person, "JW."

57.   NEWHOUSE knew the bag contained methamphetamine.

58.   NEWHOUSE said she had sold methamphetamine for "CP" in the past, and was paid in methamphetamine and cash.

59.   Marijuana is a Schedule I controlled substance.

60.   Methamphetamine is a Schedule II controlled substance and is classified as a Central Nervous System Stimulant.

61.   The physical effects of methamphetamine can include loss of appetite, hyperactivity, dilated pupils, flushed skin, excessive sweating, increased movement, dry mouth and teeth grinding (leading to "meth mouth"), headache, irregular heartbeat (usually as accelerated heartbeat or slowed heartbeat), rapid breathing, high blood pressure, low blood pressure, high body temperature, diarrhea, constipation, blurred vision,

dizziness, twitching, numbness, tremors, dry skin, acne, and pale appearance.

62.     The psychological effects of methamphetamine can include euphoria, dysphoria, changes in libido, alertness, apprehension and concentration, decreased sense of fatigue, insomnia or wakefulness, self-confidence, sociability, irritability, restlessness, grandiosity and repetitive and obsessive behaviors. Peculiar to methamphetamine and related stimulants is "punding," or persistent non-goal-directed repetitive activity. Methamphetamine use also has a high association with anxiety, depression, amphetamine psychosis, suicide, and violent behaviors.

63.     After NEWHOUSE was detained, she asked to speak to law enforcement, again.

64.     NEWHOUSE was re-Mirandized, and agreed to be interviewed.

65.     NEWHOUSE admitted to possessing approximately fifty grams of methamphetamine and the firearm.

66.     She admitted she had picked up the methamphetamine from Source # 1 earlier in the evening, and that Source # 1 was a person from

whom she had frequently purchased methamphetamine over several months.

67.   Source # 1 often gave her methamphetamine up front without paying for it, and let her pay him after she sold it.

68.   The foregoing process is commonly known in the drug trafficking trade as "fronting" drugs.

69.   At other times, NEWHOUSE paid Source # 1 beforehand for the drugs she acquired from him.

70.   NEWHOUSE both used and sold methamphetamine.

71.   Based on the information provided by NEWHOUSE, law enforcement was able to determine Source # 1's true identity.

72.   Source # 1 has a criminal record for drug-dealing offenses.

73.   NEWHOUSE often saw Source # 1 with pound quantities of methamphetamine and with a firearm.

74.   Source # 1 provided NEWHOUSE with the Ruger pistol.

75.   It is illegal under federal law to be a drug dealer or drug user in possession of a firearm.

76.   Law enforcement later determine NEWHOUSE had been giving them a false identity.

77.    NEWHOUSE was using the name of Jessica Clementi, CLEMENTI's sister, to conceal her true identity.

78.    The amount of methamphetamine seized from CLEMENTI and NEWHOUSE, as well as the currency found on them, is consistent with the sale of methamphetamine.

79.    CLEMENTI claimed the cash found on him came from a sale of a vehicle, but he could not provide any details about the alleged transaction nor could he provide any paperwork.

80.    CLEMENTI further stated he thought he had around $5,000 on his person.

81.    CLEMENTI was charged in the United States District Court for the Southern District of Iowa on January 24, 2019 with being a felon in possession of a firearm, a felony.

82.    On March 12, 2019, CLEMENTI pled guilty in the United States District Court for the Southern District of Iowa to being a felon in possession of a firearm.

83.    CLEMENTI has been a user of illegal drugs since he was approximately 12 years old, including, at times, methamphetamine, marijuana, hallucinogenic mushrooms, cocaine, and more.

14

84. CLEMENTI's possession of the Defendant property, along with the other items found on him and NEWHOUSE by law enforcement, is consistent with drug trafficking or being the courier of the proceeds of a drug trafficking crime.

## V. COUNT ONE
### (FORFEITURE UNDER 21 U.S.C. § 881(a)(6))

85. Plaintiff repeats and realleges each and every allegation set forth above.

86. The United States has reason to believe the Defendant property constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, and/or were used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841, 843, and 846 et seq.

87. As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 21 U.S.C. § 881(a)(6).

## VI. COUNT TWO
### (FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(A) & 1960(b)(1)(B)

88. Plaintiff repeats and realleges each and every allegation set forth above.

89.    The United States has reason to believe that on or about December 18, 2018, one or more persons knowingly transported the Defendant property on behalf of a money transmitting business, as that term is defined in 31 U.S.C. § 5330(d)(1) and the regulations promulgated thereunder, including 31 C.F.R. § 103.41 and § 103.11(uu)(5).

90.    Title 18 U.S.C. § 1960(b)(1)(B) defines an Aunlicensed money transmitting business@ as any money transmitting business that 1) affects interstate or foreign commerce in any manner or degree, and 2) fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, or the regulations prescribed thereunder.

91.    The money transmitting business referred to herein affected interstate commerce and failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, and the regulations prescribed under such section, as required by 18 U.S.C. § 1960(b)(1)(B). Accordingly, the money transmitting business on whose behalf the Defendant property was being transported was an unlicensed money transmitting business.

16

92.   Operation of an unlicensed money transmitting business is a violation of 18 U.S.C. § 1960(a), and all property involved in such violation is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

93.   As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 18 U.S.C. § 981(a)(1)(A).

## VII. COUNT THREE
### (FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(A) & 1960(b)(1)(C)

94.   Plaintiff repeats and realleges each and every allegation set forth above.

95.   The United States has reason to believe that on or about December 18, 2018, in the Southern District of Iowa, one or more persons knowingly transported the Defendant property on behalf of an unlicensed money transmitting business, as that term is defined in 18 U.S.C. § 1960(b)(1)(C), knowing the Defendant property was derived from a criminal offense or was intended to be used to promote or support an unlawful activity.

96.   Section   1960(b)(1)(C)   defines   an   unlicensed   money transmitting business as any money transmitting business which 1)

17

affects interstate or foreign commerce, and 2) involves the transportation or transmission of funds that the person conducting, controlling, managing, supervising, directing, or owning the business knows (A) to have been derived from a criminal offense or (B) are intended to be used to promote or support an unlawful activity.

97.    For purposes of Section 1960(b)(1)(C), money transmitting is defined to include the conduct described in Section 1960(b)(2).

98.    Operation of an unlicensed money transmitting business is a violation of 18 U.S.C. § 1960(a), and all property involved in such violation is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

99.    As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 18 U.S.C. § 981(a)(1)(A).

## VIII. CONCLUSION

WHEREFORE, the plaintiff requests that the Court issue a warrant and summons for the arrest and seizure of the Defendant property; that notice of this action be given to all persons known or thought to have an interest in or right against the property, that the

Defendant property be forfeited to the United States, and that it be awarded its costs and disbursements in this action, and such other and further relief as the Court deems proper and just under the facts and applicable law.

Respectfully submitted,

Marc Krickbaum
United States Attorney

By: /s/ Craig Peyton Gaumer
Craig Peyton Gaumer
Assistant United States Attorney
U. S. Courthouse Annex,
Suite 286
110 East Court Avenue
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

# VERIFICATION

I, Emily A. Shoff-Salsbery, hereby verify and declare under penalty of perjury that I am an Investigator with the Des Moines Police Department, Vice and Narcotics Unit, and that I have read the foregoing Verified Complaint *in Rem, United States v. $8,623.00 in U.S. Currency* and know the contents thereof and the matters contained in the Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as Investigator with the Des Moines Police Department, Vice and Narcotics Section.

Dated:  July 11, 2019.

Emily A. Shoff-Salsbery, Investigator
Des Moines Police Department
Vice and Narcotics Section